**NOT YET SET FOR ORAL ARGUMENT**

No. CA 15-1135
[Consolidated with No. CA 15-1167]

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

## FRED MEYER STORES, INC.,

Petitioner,

v.

## NATIONAL LABOR RELATIONS BOARD,

Respondent.

_____

On Appeal from the National Labor Relations Board
Case No. 36-CA-010555

_____

## FINAL BRIEF OF PETITIONER
## FRED MEYER STORES, INC.

Mitchell J. Cogen, D.C. Cir. No. 55455
Bullard Law
200 SW Market Street, Suite 1900
Portland, OR  97201
503-248-1134/Telephone
Attorneys for Petitioner
Fred Meyer Stores, Inc.

1424/315 00715909 V 1

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and the Circuit Rules of this Court, Petitioner Fred Meyer Stores, Inc. declares as follows:

1.     Fred Meyer Stores, Inc. is an Ohio corporation and a wholly-owned subsidiary of the Kroger Company.

2.     No other publicly held company owns 10% or more of Fred Meyer Stores, Inc.

3.     The Kroger Company, an Ohio corporation, has its principal place of business in Ohio and is publicly held.  No other publicly held company owns 10% or more of the company's stock.

## STATEMENT AS TO PARTIES, RULINGS AND RELATED CASES

**A.   Parties and Amici**

The parties in this matter are Petitioner Fred Meyer Stores, Inc. and Respondent National Labor Relations Board. UFCW Local 555 has moved to intervene.

**B.   Rulings Under Review**

Petitioner Fred Meyer Stores, Inc. seeks review of a final April 30, 2015 Decision and Order of the NLRB reported at *Fred Meyer, Inc. and United Food and Commercial Workers Local No. 555*, 362 NLRB No. 82 (2015).

**C.   Related Cases**

On December 13, 2012, the NLRB issued a Decision and Order in this case reported at 359 NLRB No. 34.  Fred Meyer filed a petition for review of that Order in this Court on December 26, 2012, which was docketed as Case No. 12-1486.  Following this Court's January 25, 2013 decision in *Noel Canning v. NLRB*, Case No. 12-1115, the Court placed Fred Meyer's earlier petition for review in abeyance on that date. On June 30, 2014, the NLRB vacated its December 13, 2012 Decision and Order and filed a motion to dismiss Case No. 12-1486.  On September 17, 2014, the Court granted the NLRB's Motion to Dismiss. Currently, the NLRB's related Cross-Application for Enforcement is docketed as Case No. 15-1167.

## Table of Contents

I.     STATEMENT IN SUPPORT OF ORAL ARGUMENT ..................... 1

II.    STATEMENT OF JURISDICTION ................................................. 1

III.   ISSUES PRESENTED ............................................................... 2

IV.    STATEMENT OF THE CASE ................................................... 4

V.     STATEMENT OF FACTS ......................................................... 5

       A.     Background Facts. ................................................................ 5

       B.     The CBAs Limit Local 555 Non-Employee Representatives
              Access to Fred Meyer Stores. ............................................. 7

              1.     Access is limited by a "Store Visitation" provision in
                     the CBAs. ................................................................. 7

              2.     Past practice further limits the time non-employee
                     representatives can speak to members on the sales
                     floor and the number of representatives in the store
                     at one time.............................................................. 8

                     a.     "Brief" floor interactions are limited to one to
                            two minutes by past practice............................. 9

                     b.     The number of non-employee representatives
                            permitted access is limited to two by past
                            practice. ......................................................... 11

              3.     Prior to the fall of 2009, Local 555 followed the
                     established past practices under the access
                     agreement and worked cooperatively with Fred
                     Meyer...................................................................... 13

       C.     Encouraged by the International, Local 555's New
              Leadership  Became a "Fighting Union" and Breached the
              Access Agreement............................................................... 14

i

1.  International Representative Jenny Reed ("Reed") arrives and store access issues begin. .......................... 14

2.  Decertification petitions are filed and Local 555 vows to become a "Fighting Union" under Reed's direction. ................................................... 15

3.  Local 555 unilaterally changed the Store Visitation agreement ................................................... 16

D.  The Now "Fighting Union" Targeted the Hillsboro Store and Violated the Access Agreement as Part of a Premeditated Publicity Stunt. ................................. 18

1.  The Union laid the ground work and set up the publicity stunt. .......................................... 18

2.  On October 15, eight representatives descend on the Store *en masse* and the planned confrontation occurs. ...................................................... 20

3.  Reed planned to "take the arrest" at the Store on October 15. ............................................... 21

4.  On October 15, the Union carried out its planned public confrontation and escalation at the Store. ...... 22

5.  As planned, Reed refused to comply with lawful requests by the police to leave the store and she "took the arrest." ........................................ 30

6.  Marshall and Clay refused to follow police instructions in the parking lot and were arrested. ..... 32

7.  The Union quickly capitalized on the premeditated confrontation and publicity stunt. ............................ 34

VI.   STANDING ................................................... 35

VII.  SUMMARY OF ARGUMENT .......................................... 36

VIII. ARGUMENT .................................................... 38

ii

A.    Standard of Review................................................... 38

B.    The Board Acted Arbitrarily By Ignoring Substantial Evidence That the Union Planned to Incite a Confrontation at the  Store on October 15, 2009 and  That Such Conduct Lacked Protection of the Act......................... 38

    1.    The Union planned and executed a confrontation with Fred Meyer by intentionally breaching the access agreement. ........................................ 39

        a.    The October 15 confrontation was premeditated. .................................... 40

        b.    Past practice limits the number of visiting representatives and the Union violated that practice. ............................................ 43

C.    Substantial Evidence Demonstrated That the Union Unreasonably Interrupted Employees' Work, Interfered With Customers or Disrupted Operations.  The Board's Decision is Erroneous............................................. 46

    1.    The Union representatives breached the access agreement and their conduct was unprotected........... 46

        a.    The Union unreasonably interrupted employees' work by distributing petitions and encouraging employees to read and sign them while working. ................................... 47

        b.    Sending more than two employees at once into the store unreasonably interrupted employees' work. ............................... 49

        c.    The Union further violated the store visitation agreement by interfering with customers......... 50

    2.    Fred Meyer retains discretion to determine what constitutes an unreasonable work interruption and

1424/315 00715909 V 1

the Board's finding to the contrary is antithetical to the Act. ........................................................................ 51

D.   The Board Erred in Finding that Dostert Unlawfully Disparaged the Union........................................................54

1.   The Board misinterpreted the record evidence and improperly ignored the plain language of Section 8(c). ..............................................................................54

2.   The Board's cited precedent is distinguishable...........57

E.   The Board Erred in Finding Fred Meyer Liable for the Arrests of the Union Representatives and in Ordering Fred Meyer to Make the Union Whole.................................. 58

1.   Fred Meyer's call to the police was a protected First Amendment petition to the government................... 58

2.   The Board ignored substantial evidence that the representatives' own conduct was unprotected and warranted arrest........................................................... 60

a.   Reed was not engaged in protected activity and her own misconduct resulted in her arrest................................................................. 60

b.   Clay's conduct was not protected and Marshall and Clay's failure to follow police orders resulted in their arrest...................................... 62

3.   The Board erred in finding that the arrests were the "proximate and foreseeable" result of Fred Meyer contacting the police. ................................................. 63

4.   The Board erred in ordering Fred Meyer to pay the representatives' attorney fees and costs. ....................65

F.   The Union's Motion to Intervene Should Be Denied as Untimely. ..............................................................................67

1424/315 00715909 V 1

   1. **There is no legal basis for the interpretation urged by Local 555.** ................................................................ **68**

   2. **No factual basis exists for the interpretation urged by Local 555.** ................................................................ **69**

IX. CONCLUSION ................................................................................ 71

X. ADDENDUM OF STATUTES, RULES AND REGULATIONS ....... 73

1424/315 00715909 V 1

Table of Authorities

## Cases

*Adtranz ABB Daimler-Benz Transp., N.A., Inc. v. N.L.R.B.,*
  253 F3d 19, 24 (DC Cir 2001) ...................................................................... 2

*\*Avecor, Inc. v. NLRB,*
  931 F2d 924, 928 (DC Cir 1991) ................................................................. 39

*\*Baptist Memorial Hospital,*
  229 NLRB 45 (1977). .................................................................... 67, 68, 69

*\*Conagra, Inc. v. NLRB,*
  117 F3d 1435, 1438 (DC Cir 1997). ........................................................... 39

*\*Fieldcrest Cannon, Inc.,*
  318 NLRB 470, 474 (1995)
  *enfd. in part* 97 F3d 65 (4th Cir 1996) .............................................. 59, 60

*Fred Meyer, Inc. and United Food and Commercial Workers Local No.*
  *555*, 362 NLRB No. 82 (2015) .................................................................... 1

*Gauley Industries,*
  260 NLRB 1273, 1279 (1982) ................................................................... 59

*\*Hearn Construction,*
  *354 NLRB 289, 293-94 (2009)* .................................................................. 67

*Hecks, Inc.* 215,
  NLRB 765, 767 (1974). ............................................................................. 67

*J.P. Stevens, Inc.,*
  244 NLRB 407 (1979) ................................................................................ 69

*Laborers' Dist. Council of Georgia & S. Carolina v. N. L. R. B.,*
  501 F2d 868, 874 (DC Cir 1974) ............................................................... 56

*\*Macerich Property Management Company,*
  *1999 WL 33452912 at 8-10 (Feb 5, 1999)* ................................................. 67

vi

*Mazzara Trucking & Excavating Corp. & Local 172,*
   *Laborers Int'l Union of N. Am.,*
   362 NLRB No. 79 (Apr 30, 2015) ............................................................ 48

*\*McPherson v. State ex rel. Dep't of Corr.,*
   210 Or App 602, 615, 152 P3d 918, 925 (2007). ....................................... 68

*\*Nader v. Democratic National Committee,*
   567 F3d 692, 696 (DC Cir 2009) ............................................................. 61

*\*Reno Hilton Resorts v. NLRB,*
   196 F3d 1275 (DC Cir 1999) ................................................................... 39

*Sears Roebuck and Co.,*
   305 NLRB 193 (1991) ............................................................................. 59

*\*Turtle Bay Resorts,*
   353 NLRB 1242, 1278-1279 (2009)......................................................... 59

*\*Venetian Casino Resort, L.L.C. v. N.L.R.B.,*
   793 F3d 85, 87 (DC Cir 2015)................................................................. 62

*\*Venetian Casino Resort, LLC,*
   355 NRLB No. 165 (August 27, 2010) ..................................................... 61

*Wellman Industries,*
   248 NLRB 325 (1980) ............................................................................. 68

*\*Wild Oats Markets, Inc.,*
   336 NLRB 179 (2001) ............................................................................. 66

**Statutes**

28 USC § 2071.......................................................................................... 72
29 USC § 158 ........................................................................................... 56
29 USC § 160............................................................................... 1, 37, 72
29 USC §151 ............................................................................................ 53

1424/315 00715909 V 1

**Rules**

FRAP 15 ................................................................................................68-72

*Authorities upon which we chiefly rely are marked with asterisks.

1424/315 00715909 V 1

## I.     STATEMENT IN SUPPORT OF ORAL ARGUMENT

Petitioner Fred Meyer Stores, Inc. ("Fred Meyer") respectfully requests oral argument in this case.  In light of the factual and legal complexity of the issues presented regarding the National Labor Relations Act ("NLRA" or "Act") and other laws and cases, oral argument will assist the Court in reaching a full and complete understanding of the issues and allow counsel to address any questions from the panel.

## II.     STATEMENT OF JURISDICTION

On May 12, 2015, Fred Meyer filed a Petition for Review of a final, April 30, 2015 Decision and Order of the NLRB  reported at *Fred Meyer, Inc. and United Food and Commercial Workers Local No. 555*, 362 NLRB No. 82 (2015) ("Order;" DA 192-199)[1]).  This Court has jurisdiction to review this final Order pursuant to Sections 10(e) and (f) of the NLRA. *Id.*, 29 USC § 160(e) and (f). *Adtranz ABB Daimler-Benz Transp., N.A., Inc. v. N.L.R.B.*, 253 F3d 19, 24 (DC Cir 2001).

---

[1] The Parties have agreed to utilize the deferred appendix procedure set forth in F.R.A.pp.P. 30(c).  The Deferred Appendix is referred to herein as ("DA ___").

1424/315 00715909 V 1

### III.   ISSUES PRESENTED

1.     Whether the factual findings in the Order are supported by substantial evidence.

2.     Whether the NLRB failed to apply the proper legal standards in determining that Fred Meyer violated Section 8(a)(1) and (5) of the National Labor Relations Act (the "Act").

3.     Whether the NLRB erred in finding that Fred Meyer violated Section 8(a)(1) and (5) of the Act by unilaterally changing terms and conditions of employment at Fred Meyer's Hillsboro, Oregon store (the "Store") on October 15, 2009.

4.     Whether the NLRB erred in finding that Fred Meyer lacked discretion under the access-visitation agreement to determine what conduct unreasonably interfered with employees' performance of their duties.

5.     Whether the NLRB erred in finding that non-employee Union representatives did not unreasonably interrupt employees' work or disrupt operations in any way at the Store on October 15, 2009.

6.     Whether the NLRB erred in failing to find that on October 15, 2009, the Union breached the access-visitation agreement by

1424/315 00715909 V 1

not first contacting the store manager at the Store prior to visiting the Store or contacting employees on union business during working hours, and/or by sending eight, non-employee Union representatives into the Store, and/or by demanding an unlimited amount of time for the non-employee Union representatives to speak with employees while working, and/or by distributing and soliciting signatures on petitions from employees while working.

       7.     Whether the NLRB erred in finding that the non-employee Union representative protest on October 15, 2009 was not governed by the access-visitation agreement.

       8.     Whether the NLRB erred in finding that the non-employee Union representatives engaged in protected activity under the Act on October 15, 2009.

       9.     Whether the NLRB failed to give proper weight to undisputed testimony that the non-employee Union representatives' protest on October 15, 2009 was a premeditated confrontation and failed to properly find that such a premeditated confrontation lacked protection under the Act.

3

10.    Whether the NLRB erred in finding that Fred Meyer unlawfully disparaged the Union where the undisputed record evidence reflects that the allegedly disparaging comments contained no threat of reprisal or force or promise of benefit and the record contains no evidence that the allegedly disparaging comments were heard by any employee.

11.    Whether the NLRB erred in finding that Fred Meyer unlawfully threatened to have the Union representatives arrested, contacted the police and caused the Union representatives' arrest and prosecution.

12.    Whether the NLRB erred in ordering Fred Meyer to make the Union representatives whole for costs incurred as a result of their arrests.

## IV.   STATEMENT OF THE CASE

This case arises out of a premeditated publicity stunt by the United Food & Commercial Workers Union, Local 555 ("Local 555") and the UFCW International (collectively "Union") at the Store on October 15, 2009.  Ultimately, three UFCW representatives were arrested that day. One of those representatives, Jenny Reed ("Reed"), is an employee of the UFCW International and the remaining two representatives, Dan Clay ("Clay") and

Mike Marshall ("Marshall") are employees of Local 555. They were arrested on charges of criminal trespass under Oregon state law after the Union created a 45-minute disturbance as part of a well-orchestrated plan to create a publicity event at the Store in violation of applicable contracts between Fred Meyer and Local 555.

This is an appeal from the Order upholding and adopting, with slight modification, the December 8, 2010 Administrative Law Judge's decision. ("ALJD;" DA 25-70). The Administrative Law Judge ("ALJ") and Board found that Fred Meyer violated Sections 8(a)(1) and (5) of the Act. Fred Meyer contends that the ALJ and the Board erred in numerous respects and requests the Court grant Fred Meyer's Petition for Review and deny the NLRB's Cross-Application for Enforcement and Local 555's Motion to Intervene.

## V.    STATEMENT OF FACTS

### A.    Background Facts.

Fred Meyer is engaged in the operation of "one-stop" shopping retail stores in Alaska, Washington, Idaho and Oregon. (DA 435, 7094-811.) Fred Meyer operates many stores throughout the Portland, Oregon metro area, including the Store at issue. (DA 437, 742-745.) Fred Meyer is

5

party to several contracts with Local 555 applicable to its stores in Oregon and Southwestern Washington and bargains many of its contracts with the Union as part of a multi-employer association that includes Safeway and Albertsons. (*See, e.g.*, DA 556 "Extension Agreement"). Together, they are referred to as the "Big Three" employers ("Employers"). (DA 240, 437, 1210.) Several of these contracts apply to Fred Meyer's stores in the Portland, Oregon metro area ("Portland Contracts"), including the Store.

Fred Meyer's stores are generally organized into four different units: Grocery, Combined Checkstand ("CCK"), Meat/Seafood, and Non-foods. (DA 438-439.) Where these units are represented by a union, each unit has its own contract. The Portland Contracts include multi-store Grocery, CCK, Meat/Seafood, and Non-foods contracts. All four units and their applicable contracts are present in the Store. (DA 439.) The International is not a party to any of the Portland Contracts or to any other contracts with Fred Meyer. (DA 556-738.)

6

**B.     The CBAs Limit Local 555 Non-Employee Representatives Access to Fred Meyer Stores.**

**1.     Access is limited by a "Store Visitation" provision in the CBAs.**

Non-employee representatives of Local 555 are provided only limited access to Fred Meyer's Portland metro area stores, including the Store.  The parties have bargained a "Store Visitation" or "access" provision in the applicable CBAs.  This provision applies only to Local 555 non-employee representatives; International representatives have <u>no</u> contractual right to access or remain on Fred Meyer property at any time.  (DA 556-675, 739.)

The access provision has been in effect for at least 20 years and provides:

> ARTICLE 13 - GENERAL CONDITIONS
>
> 13.11  <u>Store Visitation</u>.  It is the desire of both the Employer and the Union ***<u>to avoid wherever possible the loss of working time by employees covered by this Agreement</u>***.  Therefore, representatives of the Union when visiting the store or contacting employees on Union business during their working hours ***<u>shall first contact the store manager or person in charge of the store.  All contact will be handled so as to not interfere with service to customers nor unreasonably interrupt employees with the performance of their duties</u>***.

(DA 556-675) (emphasis added) (DA 409, 435, 440-441.)

7

## 2. Past practice further limits the time non-employee representatives can speak to members on the sales floor and the number of representatives in the store at one time.

The parties have developed the following past practice to limit customer interference and employee interruption under the access provision:

1). When representatives visit the stores, they must check in with the Manager on Duty ("MOD");

2). Representatives may walk the sales floor to observe working conditions and notify employees of their presence;

3). Representatives may hand out business cards and engage in brief conversations with employees working on the sales floor; and

4). If these conversations are going to be longer than a few minutes, the conversation must be continued when the employee is on break (in the lunchroom or other such locations).[2]

The Big Three Employers all have the same contractual access provision and follow the same past practice. (DA 240-241, 280, 345-346.) After Safeway's Director of Labor Relations memorialized this past practice in a 2002 memorandum, Local 555 adopted that memo as "correctly

_____

[2] The Portland Non-Foods contract does not contain a Store Visitation clause, but the Employers apply the same past practice to visits made to the Non-Foods employees. (DA 201-204.)

8

outlin[ing] the procedure that should be followed when we visit stores."

(DA 547-550, 787-789.)  The memorandum states in pertinent part:

> UFCW 555 Business A[g]ents are in our stores
> frequently...Business agents in our stores have certain rights
> and obligations, as do we during their visits...
>
> . . . .
>
> Business agents have the right to talk BRIEFLY with employees
> on the floor, to tell those employees they are in the store, to
> introduce themselves, and to conduct BRIEF conversations, as
> long as the employees are not unreasonably interrupted.  Such
> conversations should not occur in the presence of customers.
>
> Business Representatives have **the right to distribute flyers**
> to employees on the floor AS LONG AS IT IS DONE QUICKLY,
> **THE EMPLOYEES ARE NOT URGED TO STOP WHAT
> THEY ARE DOING TO READ THE MATERIALS AT
> THAT TIME**, AND FURTHER, THAT THE MATERIALS ARE
> NOT PASSED OUT IN THE PRESENCE OF CUSTOMERS.
>
> Business agents have the right to distribute materials in the
> break room. **Lengthy conversations and discussions
> should always take place in the break room**...
> (*Id.*)(capitalized emphasis original: bold emphasis added)

>   a.   **"Brief" floor interactions are limited to one
>         to two minutes by past practice.**

According to Richter Ball ("Ball"), Assistant Bargaining Director

for the Union from 1999-2002 and Bargaining Director and Organizing

Director from 2008 to approximately 2009, the memorandum accurately

portrays the parties' past practice.  (DA 402-406, 460.)  Both General

9

Counsel's and Fred Meyer's witnesses testified that the past practice limited such interactions to one to two minutes.

GC witness Lance Larsen ("Larsen"), employed at the Store since November 2007, testified that his conversations on the sales floor with representatives usually lasted one to two minutes. (DA 263.)  GC witness Mary Spicher ("Spicher"), the Store's Local 555 non-employee representative from April 2008 through November 2009, testified that she limited her conversations with employees on the sales floor to "a couple of minutes."[3]  (DA 272, 281.)  GC witness Brian Cushing ("Cushing"), employed at the Store since September 2008, testified that his interaction on the floor with Union representatives averaged one to two minutes. (DA 268.)  GC witness Lance Epling ("Epling"), a nine-year Store employee, testified that Local 555 representatives only spoke with him in the breakroom.  (DA 393.)

---

[3] Spicher briefly visited employees around the store, including in the lunchroom (also referred to as the break room) (DA 270).  Spicher also conversed with employees off work by telephone and email.  (DA 270.)

Hillsboro store management testified similarly.[4]  Store Director Gary Catalano ("Catalano"), Store Director for one-and-a-half years at the relevant time, testified that store managers "ask that [representatives] keep their conversations brief and not interrupt their job duties or not interrupt their interaction with customers" and for longer conversations, "they're allowed to talk to them on -- again, on their break or on their lunch hour ***."  (DA 394-395.)  James Dostert ("Dostert"), Home Department Manager at the Store since August 2009, testified that "They are supposed to check in.  They have the right to walk the floor, engage with associates, hand out the card, engage for a minute or two, and then any lengthier conversations need to be taken to the break room."  (DA 464.)

> **b.    The number of non-employee representatives permitted access is limited to two by past practice.**

Past practice also limits the number of non-employee representatives allowed access.  Union official Ball acknowledged that Local 555 had consistently limited the number of representatives sent to a store

---

[4] These have been the uniform and consistent practices at all Fred Meyer stores covered by contracts with the Union since at least 1993 and all managers are trained on these practices.  (DA 436, 440-442, 444-445, 462-263.)

11

to two and he could not recall the Union ever sending more than two at once.  (DA 412.)  Ball testified that sending more than two representatives at one time would interfere with employees' work and/or disrupt the employer's business and would violate the access provision.  (DA 410-411, 415-416.)

Both General Counsel's and Fred Meyer's witnesses confirmed that the application of the past practice at the Store limited to two the number of representatives on the floor at once.  GC witness Spicher testified that she visited the Hillsboro store two to three times a month, mostly by herself.  (DA 271, 281, 287.)  GC witness Cushing testified the Local 555 representative was typically alone, but on rare occasions, two may have visited the store when a new representative was being trained. (DA 265, 269.)  Cindy Thornton ("Thornton"), Fred Meyer's Vice President, Labor and Associate Relations, testified similarly.  (DA 443-444.)

GC witness Larsen testified that he never saw more than two Union representatives in the store prior to the incident on October 15, 2009.  (DA 261-262, 264.)  GC witness Epling noted that even during the Union's campaign to organize the Non-foods employees, he only saw one to two Union representatives in the store at any one time.  (DA 390-392.)

Manager Dostert, employed by Fred Meyer since 1996 and who spends 80% of his time on the sales floor, testified that he would only see one Union representative in the store at a time, roughly once a month. (DA 461, 465-466.)

### 3.   Prior to the fall of 2009, Local 555 followed the established past practices under the access agreement and worked cooperatively with Fred Meyer.

Until the fall 2009, the mutually-agreed past practices were regularly followed by Local 555 representatives at the Store. The parties also had a general practice of informally resolving any disagreements that may have arisen regarding visitation; Local 555 representatives would contact the company's Human Resources Department, who would in turn contact store managers in order to resolve the dispute. (DA 321, 343-344, 441, 447, 547.)

A few times in the past, visitation issues could not be resolved and Fred Meyer had to resort to seeking police assistance in escorting Local 555 representatives out of the store. (DA 449-450.) Prior to the instant circumstances, Union representatives had always left the stores of their own accord, no arrests were made, and Local 555 never took exception to Fred Meyer seeking police assistance under such circumstances. (DA 450.)

13

**C.    Encouraged by the International, Local 555's New Leadership Became a "Fighting Union" and Breached the Access Agreement.**

Bargaining for successor Portland Contracts began in approximately July 2008 and in November 2008, Local 555 leadership that included Ball lost the union election.  (DA 414, 761-763.)  New leadership, led by Union President Clay was elected. (DA 332.)

**1.    International Representative Jenny Reed ("Reed") arrives and store access issues begin.**

Bargaining for successor Portland Contracts continued with the new leadership.[5]  In July 2009, Clay requested help with bargaining from the International.  (DA 205, 412.)  Bargaining had been ongoing for about 14 months and International representative Jenny Reed ("Reed") arrived to assist Local 555.  (DA 205.)

As a result of Reed's arrival, Local 555 significantly increased its activity in the Big Three's stores.  (DA 252.)  Following Reed's arrival, union representative visits to the Employer's stores increased and Reed encouraged representatives to change their visit routines.  (DA 253.)  Despite instructing representatives to engage in conduct that directly

---

[5] New Portland Contracts were ratified in January 2010.  (DA 409.)

14

implicated the access agreement and related past practices at the Store,

Reed ***never received any training about the visitation practices***

***at the Store***.  (DA 254.)  Reed had only been to the Store a few times on

routine visits and, prior to October 15, 2009, Reed had never visited the

store with more than one other representative.  (DA 255.)

###### 2.    Decertification petitions are filed and Local 555 vows to become a "Fighting Union" under Reed's direction.

In the fall of 2009, employees at Fred Meyer's Bend and Coos

Bay, Oregon stores filed petitions to decertify Local 555.  (DA 445.)  In

response, Local 555 focused on broadening its access to Fred Meyer's

stores.  On September 17, 2009, Reed and other union representatives met

with Local 555's attorney to discuss "access to Fred Meyer stores, ***strategy***

***and implementation***."  (DA 759.) (emphasis added.)  Spicher's

September 21, 2009 route sheet for the Store indicates her plan to call

several employees to "ask about [the] practice of talking to memb[ers] on

floor," in anticipation of filing a grievance.  (DA 760.)

On September 25, 2009, Local 555 leadership declared to its

members that "WE ARE A FIGHTING UNION" and promised that it

"would do what is necessary to return to a fighting union."  (DA 252, 767-

771) (emphasis original.)  On that same date, Local 555 filed an unfair labor practice charge alleging that Fred Meyer unilaterally changed the access provisions in the Portland Metro, Bend and Coos Bay stores. (DA 825.)  On October 13, 2009, (just two days before the October 15, 2009, incident at issue) Local 555 asked all of its field representatives to "gather information" in support of its unfair labor practice charges regarding access to Fred Meyer stores.  (DA 772-773.)

### 3.    Local 555 unilaterally changed the Store Visitation agreement.

Spicher, Local 555's representative at the Store, testified that just prior to October 2009, Local 555 changed its tactics. Under the direction of the International organizing representatives (from the International or borrowed from other locals) the International began to push Local 555 representatives to act more like organizers in stores. (DA 282, 290, 761-766.)  Neither the International representatives nor representatives from any other local had any contractual right to access Fred Meyer's stores.

Nikki Miller ("Miller"), an organizing representative from a UFCW local in Auburn, Washington, trained Spicher in the new, "fighting union" protocol.  (DA 764-766.)  Spicher had never gone into the Store with

**16**

an International representative before.  In violation of the Store Visitation agreement, Miller directed Spicher to take a petition into the store and discuss it with and seek signatures from employees while working on the sales floor.  (DA 283, 285-286.)

In her report to the Union, Miller criticized Spicher's reluctance to violate the parties' access agreement.  (DA 764-766.)  Although Spicher acknowledged that, in the past she "absolutely" did not expect employees to read materials while working. Miller panned Spicher for simply handing the petition and a flyer to a working employee on the floor without taking the employee's time to explain each in detail.  (DA 288-289.)  Miller was angry that Spicher advised employees to review and sign the petition while on lunch, contrary to Miller's instruction to interrupt employees and have them interrupt their coworkers to discuss and get the petition signed while working.  (*Id.*)

In response to an employee's question about the CBA, Spicher said "I can't help you with that now.  ***They're not allowing me to do my normal job***.  We have this petition we are trying to get signatures for."  She also told him, "***They chewed my ass last night.  I got it good***." (*Id.*)(emphasis added) Miller made clear that she was upset that

17

Spicher "***didn't have any intention of learning from me or following through with the program we had been instructed on the previous night***." (*Id.*) (DA 764-766) (emphasis added.)  According to Spicher, about 75% of the employees stopped working to read the petition, which "took some time."  (DA 284.)

Reed testified that after she arrived to assist Local 555, a number of issues with store access began.  (DA 249.)  Store managers began to report to Thornton that unlike before, multiple representatives were coming into the stores, sometimes three or four at a time.  (DA 445, 455, 457.)  Further, the representatives were failing to check in with the MOD and/or were talking to employees at length on the sales floor.  (DA 445.)  Unlike before Reed's arrival, when store management asked the representatives to take their lengthy conversations to the lunchroom, the representatives became confrontational.  (DA 445, 456.)

**D.    The Now "Fighting Union" Targeted the Hillsboro Store and Violated the Access Agreement as Part of a Premeditated Publicity Stunt.**

**1.    The Union laid the ground work and set up the publicity stunt.**

On October 14, 2009, Josh Selch ("Selch"), a Store manager, contacted Catalano to tell him he saw two union representatives, Spicher

and Joe Price ("Price"), an International Representative from Georgia, blocking customer access to an aisle and preventing an employee from doing his job. When Catalano spoke with Price about the issue, the discussion had become "heated." (DA 273, 395.)

Catalano approached Price and Spicher to discuss the situation and attempted to reiterate the visitation practice. (DA 396.) Price was angry and kept interrupting Catalano. (DA 277, 396.) Price threatened, "[W]ell what if I just bring in 15 or 20 more people tomorrow and we just do our thing tomorrow ***?" (DA 397.)

Catalano did not tell Price or Spicher that they had to go to the break room or that they had to leave the store. Rather, he simply walked away from the confrontation and contacted Thornton to report the misconduct and threat. (DA 397-398.) Planning for the threatened onslaught the next day, Thornton advised Catalano to 1) reiterate the visitation practice to the union representatives; 2) if they refused to follow the agreement and practice, they should be asked to leave the store; 3) if they refused to leave the store, Loss Prevention should then ask the Union representatives to leave the store; 4) if they still refused to leave the store,

1424/315 00715909 V 1

Thornton should be consulted and, if then advised to do so, the  police

should be called for assistance.  (DA 398.)

Catalano held a meeting with his department managers,

including Dostert, and instructed them to follow Thornton's procedure if a

large number of union representatives returned to the store the next day.

(DA 399.)

> **2.    On October 15, eight representatives descend on the Store *en masse* and the planned confrontation occurs.**

After Price breached the access agreement and instigated the

confrontation with Catalano on October 14, the Union later that day

conducted tactical training in preparation to besiege the Store the next

day.[6]  (DA 208.)  Reed divided the attendees into teams and assigned

herself to a team of eight to overrun the Store.  (DA 208, 257.)  Although

lacking experience with the Store, Reed testified that she targeted the Store

because she believed store management presented a "significant obstacle"

to her goals.  (DA 216.)

---

[6] Assisted by International Vice President Shaun Barclay ("Barclay") and Union President Clay, Reed conducted a four to six hour training session the night before storming the Store.  (DA 208-209, 257-258, 360.)

1424/315 00715909 V 1

Ken Spray ("Spray"), Local 555's Collective Bargaining Director attended the tactical training that night. Spray admitted that Local 555 had never before sent eight representatives into the Store and that it was unusual to be sending that many representatives into the store. (DA 362.) Spray further admitted that the Union anticipated that sending eight representatives into the store would prompt a response from Fred Meyer; they "were expecting to have some access issues" and the purpose of the tactical training was to "be able to deal" with anticipated confrontation they expected at the Store the next day. (DA 361-363.) Spray testified that although they planned for and expected an escalation and confrontation at the Store, they did not discuss or plan for any means of de-escalation after the hoped for confrontation. (DA 363.)

### 3. Reed planned to "take the arrest" at the Store on October 15.

In advance of the hoped-for confrontation and escalation at the Store, the Union planned for the likelihood that an arrest might occur. (DA 361.) Spray testified it was agreed at the training that ***Reed "was going to be the one that was going to take the arrest."*** (DA 364, 366)(emphasis added.) Ball testified that Reed's planned arrest was strategic because "[t]o take eight of us out of the field and put us in jail

21

probably would have hampered the ability of the Union to continue its functions"; there was "[n]o point in running up more legal costs"; and "it's better to have the International staff be arrested" over access issues because the International was not signatory to the CBA.  (DA 367, 411-413.)

### 4.    On October 15, the Union carried out its planned public confrontation and escalation at the Store.

With their plot in place, Reed and her team arrived at the Store around 9:30 a.m. on October 15, 2009.  (DA 213, 369.)  The team was comprised of non-employee union representatives: Reed and Price from the International, and Spray, Brad Witt ("Witt"), Kevin Billman ("Billman"), Marshall ,Kathy MacInnis ("MacInnis"), and Jeff Anderson ("Anderson") from Local 555.  To ensure their media and publicity goal, they were joined by J. D. "Donna" Nyberg ("Nyberg") for a total of nine non-employees entering the store that morning.  (DA 213-214, 385.).[7]  Witt told Nyberg to join the team that morning because "***I felt there was a potential story there.  She has credentials for the labor press.  And I, frankly, was hopeful that she might be able to get a story***."  (DA 385-386)

_____

[7] Witt was also an Oregon State Representative at the time and Nyberg was his campaign manager as well as a freelance photographer with a printing press operation.  (DA 347, 368, 385.)

1424/315 00715909 V 1

(emphasis added.)  Although not employed  on October 15, Nyberg was hired by Local 555 the month following the publicity stunt.[8]  (DA 350, 355.)

The Union representatives, each wearing either a yellow t-shirt or a dark blue jacket with the words "UFCW" emblazoned on it, assembled in the store's parking lot.  (DA 218, 259.)  Once assembled, they fanned out and entered the store *en masse* through multiple different store entrances. (DA 259.)  Reed and Witt entered through the Apparel Department doors, went directly to the Customer Service Desk and asked to speak to the Manager on Duty ("MOD").  (DA 219-222, 323.)  Customer Service called Dostert, who was the MOD that morning.  (DA 467-471.)  In breach of the access agreement, only Reed and Witt contacted Dostert that morning.  The rest of the Union representatives quickly dispersed throughout the store in teams of two to talk to employees and distribute petitions and flyers.  (DA 216, 356-357.)

Dostert introduced himself to Reed and Witt.  Witt introduced himself, shook hands with Dostert and gave Dostert his card.  (DA 472.)

---

[8] Nyberg's photographs were subsequently used in numerous press items, including those that appeared in the labor press.  (DA 774-786, 817-824.)

Reed did not introduce or identify herself in any way.  (*Id.*)  The representatives told Dostert that they were checking in and were in the store to talk to employees.  (*Id.*)  Per instruction and consistent with  past practice, Dostert told Witt and Reed that they had a "right to walk the floor, engage with associates for a minute or two, hand out your card; anything longer than that needs to go to the break room."  (DA 472.)  Reed held up a piece of paper and said she had a right under "federal law" to "talk to [employees] ***as long as they wanted to***."  (DA 473) (emphasis added.) Dostert knew that Union representatives did not have the right to talk to employees on the sales floor for as long as they wanted, so he reiterated the visitation practice to Reed.  (*Id.*)  Reed told Dostert that he was "violating federal law," held out a colored piece of paper (an excerpt of the access agreement) and told Dostert that he could be arrested and end up in court. (*Id.*)[9] Dostert told Reed that he disagreed that representatives could talk to employees on the floor for as long as they wanted and that he would call Thornton for clarification.  (DA 473-474.)

---

[9] Reed was also carrying a flyer to be distributed to employees and a petition regarding health care for employee signatures.  (DA 218, 759, 812-813.)

1424/315 00715909 V 1

Dostert called Thornton and told her that he was having some trouble with two union representatives who did not want to follow the visitation practice, that they were waving a piece of paper in his face and were telling him they could talk to employees for as long as they wanted. (DA 224, 446, 469-470.)  Thornton reviewed the access agreement and practice with Dostert and instructed him to reiterate the agreement and practice to the representatives and ask them to comply.  (DA 446.) Thornton told Dostert that if they still refused to comply, he should ask them to leave the store.  If they refused to leave when requested, Loss Prevention should be contacted and then, if necessary, the police should be called for assistance removing them from the store.  (DA 475.)

Dostert told Reed and Witt that Thornton had confirmed that the visitation practice had not changed.  (DA 476-477.)  Reed repeated to Dostert that he was violating federal law again, held the paper up to Dostert's face, and told him he could be arrested.  (DA 476.)  Realizing that the situation was escalating, Dostert drew Reed and Witt away from the Customer Service Desk in an attempt to avoid interference with customers and calm the situation.  (DA 477-478.)  Reed continued to state that she could talk to employees for as long as she wanted.

25

To prove her point and further incite Dostert, Reed walked over to the Apparel cashier check stands where Alicia England ("England") was working on a project. (DA 340, 477.) According to England, who is hard of hearing and must wear hearing aids, Reed approached her abruptly, unlike a typical union representative, and she felt overwhelmed. (DA 325-327, 330, 477.) England stopped working when Reed approached her and Reed said, "I have the right to speak to you, I'm from the Union" and handed England a piece of paper. (DA 328-329, 331.) After England took the paper from Reed, Reed and Dostert moved away. (DA 330.)

During the fifteen minutes since the beginning of the Union's offensive, Dostert had received numerous calls notifying him that there were other representatives present on the floor who were trying to get employees to sign a petition while working. (DA 481, 496.) Dostert began to notice other representatives coming into the area where he was standing with Reed and Witt, so he decided to call Thornton again. (DA 481.)

Dostert told Thornton there were multiple representatives in the store, that it did not appear the situation was not going to resolve itself and asked what he should do. (DA 446-447, 482.) Thornton again told Dostert that if the representatives were not going to follow the access

agreement, they should be asked to leave the store, Loss Prevention should be contacted and, if needed, the police as well. (DA 447.)

Dostert called Mike Kline ("Kline"), the store's Loss Prevention Manager, who explained the trespass rules and asked Reed and Witt to leave the store. (DA 482-483.) Dostert received a phone call and while Dostert was talking on the phone, Witt walked up, got right next to Dostert's face less than one foot away and proceeded to yell "liar!" at Dostert. (*Id,* DA 432.) Dostert tried to retreat, but Witt followed him and continued to yell "liar!" in Dostert's face. (DA 432, 483.) Dostert asked Kline to step between himself and Witt for protection. (*Id.*)

More union representatives were coming into the area and Marshall, Spray and MacInnis all approached Dostert. (DA 305, 358, 483-484.) Dostert felt the situation worsening and again told Reed and Witt that the whole situation could be over if they would just follow the access agreement or leave the store. (DA 484.) Reed and Witt continued to refuse to follow the store visitation rules, so Dostert called Thornton a third time. (*Id.*)

Dostert told Thornton things seemed out of control and Thornton repeated her instructions to Dostert. (DA 447.) Thornton did not

27

advise Dostert to have the police arrest the Union representatives.
(DA 449.)  Rather, on all prior occasions that Local 555 representatives had
refused to follow the access agreement, the representatives were informed
that if they did not leave the store, they would be trespassing and Fred
Meyer would call the police.  (DA 450.)  Without exception with these prior
incidents, the representatives either left before the police arrived or left
voluntarily once the police arrived.  (*Id.*)  Thornton and Dostert assumed
that on that day, the representatives would do the same as has occurred in
the past and simply leave.  (DA 449-450.)

Dostert hung up with Thornton and asked Kline to call the
police.  (DA 485.)  Kline first called his Loss Prevention supervisor to
confirm that it was appropriate to call the police for assistance in escorting
the representatives from the store.  (DA 431.)  Kline then called the non-
emergency number for the Hillsboro Police Department.  (*Id.*)

In the meantime, Thornton received a call from International
VP Barclay, who said he heard that Thornton was ordering the
representatives to leave and she was calling the police to arrest them.
(DA 447-449.)  Thornton told Barclay there were multiple representatives
in the store and they were being disruptive, so they were asked to leave.

28

(*Id.*)  Barclay said he had sent those representatives in there because of something that happened the day before.  (*Id.*)

Thornton asked why Barclay hadn't simply called her to discuss and resolve any earlier issue. Barclay said that this is how he handled things.  (*Id.*)  Barclay stated that he had trained the representatives not to interfere with work.  However, ***exactly like Reed's challenge to Dostert***, Barclay said the representatives could talk to the employees as long as they wanted, as long as they didn't interfere.  (*Id.*)

Thornton disagreed and told Barclay his position was not consistent with past practice.  Thornton described the well-established practice, including that longer conversations had to take place in the lunchroom.  Barclay threatened that if this was how Thornton was going to handle things, he could send 15 representatives to the Store. (*Id.*) Thornton tried to convince Barclay to tell the representatives to leave so they could sit down and talk about how to resolve any differences that might exist or she requested Barclay file a grievance instead of conducting the preplanned in-store demonstration to address any access issues the Union may have. Barclay replied, "You do what you have to do and I'll do what I have to do." (*Id.*)

1424/315 00715909 V 1

It took about ten minutes for the police to arrive at the Store. (DA 485.)  During that time, Dostert reiterated to Reed and Witt that the situation could end right then if they simply agreed to follow the policy or leave.  (DA 486.)  Reed stated that she would not leave the store unless she was arrested.  (DA 485.)

Marshall called Reed and told her that the police had arrived in the parking lot.  (DA 389.)  In accordance with their plan, Witt confirmed with Reed that she did not have anything in her purse that could be mistaken for a weapon and Reed handed her purse over to Witt before the police entered the building. Witt then left the area with Reed's purse.  (DA 389, 487, 748:10:11:43.)

### 5.    As planned, Reed refused to comply with lawful requests by the police to leave the store and she "took the arrest."

Hillsboro Police Officers Daniel Mace and Victor Kamenir entered the store at 10:12 a.m.  (DA 748.)  They consulted with Kline and Dostert, who advised them that the union representatives were refusing to leave the store after having been asked to do so by Dostert.  (DA 433, 487.)  Officer Mace instructed Dostert to again ask them to leave the store.  (DA  433.)  Dostert did so.

30

Officer Mace explained to Reed that she had been asked to leave by the property owner and then he asked Reed to leave the store.  (DA 499, 514.)  Reed refused, saying that she had a right to be in the store "under some kind of labor union deal."  (DA 499.)  Officer Mace informed her that under Oregon trespass law, she was obliged to leave the property when the property owner asked her to leave.  (DA 499.)  Officer Mace testified that he asked Reed several times to leave the store because he didn't want to have to arrest her.  (DA 499.)

Reed was advised that if she refused to leave, she would be taken into custody.  (DA 518.)  Reed asked what the charge would be and the officers informed her it would be criminal trespass.  (DA 434.)  When told of the trespass charge Reed said, "I can take a trespass charge." Officer Kamenir testified that Reed said, "I'm ready, or I've been authorized to be arrested or something like that."  (DA 434.)  Reed then stuck her hands out together in front of her to be cuffed.  (DA 434, 499, 518.)  Officer Mace testified that at that point, Reed had taken "all [his] options away," so he reluctantly handcuffed her and escorted her out to his patrol car.  (DA 501, 507.)  Had Reed followed the Officer's instruction to leave, she would not have been arrested.  (DA 500.)

31

Despite responding to many trespass calls and making hundreds of arrests, this was the first time in Officer Mace's experience that anyone had ever stuck their hands out to be handcuffed.  (DA 509.)  While escorting Reed to his patrol car in the parking lot, Nyberg asked Officer Mace to pose for a picture of him and Reed. (DA 501, 518-519.)  This was also the first time Officer Mace had ever been asked to pose for a picture while making an arrest. (DA 500.)

### 6.    Marshall and Clay refused to follow police instructions in the parking lot and were arrested.

Although he stood by Reed the entire time he was in the store berating Dostert, Witt was not arrested that day.  Witt promptly obeyed the police officers' instructions to leave the store once they arrived and he left with Reed's purse safely in tow.  (DA 553-554.)  The other representatives in the store also exited once asked to do so by police.  (DA 489.)  Reed was the only representative arrested inside the store.

Marshall and MacInnis walked through the parking lot to the cars that they had arrived in, but the drivers were not there and they could not get in the cars.  (DA 533.)  Sergeant Shannon (who had arrived on the scene shortly after Officers Mace and Kamenir) told Marshall to leave the property, making "shooing" motions towards Marshall.  (DA 519.)  Instead

of complying, Marshall became "agitated", "tried to engage the sergeant" and said that he had to retrieve the car keys.  (DA 308, 359.)

Officer Mace observed Marshall arguing with Sergeant Shannon and he felt things were "starting to get a little hairy" and  were "getting a little out of hand" in the parking lot, so backup units were requested.  (DA 502-503- 519.)  Customers in the parking lot began to gather to watch the scene and according to Officer Mace, "*[i]t was starting to become a distraction to the community.*"  (DA 504)(emphasis added.)

Marshall continued to argue with Sergeant Shannon, so Officer Kamenir placed Marshall under arrest.  (DA 505.)  As Officer Mace testified, "I just – I'm going to ask you to do something once, and I'm not going to beg you to leave.  But at that point, we kept begging, begging, begging, and we were done.  I was finished playing."  (DA 505.)  MacInnis, who was standing within five feet of Marshall at the time, was not arrested. (DA 534-535.)

Clay arrived at the scene, walked up to Sergeant Shannon and told the Sergeant that he was responsible for assigning people to go to the store that day and asked him not to arrest anyone.  (DA 335-337.)  Clay asked Sergeant Shannon to "look at Federal law before he arrest people."

33

(DA 337.)  Sergeant Shannon stated that the property owner had asked the representatives to leave, so they needed to leave.  (DA 338.)  Clay continued to argue that they had the right to be on the property under federal law. (DA 338.)  Sergeant Shannon said, "another word and you're done." (DA 338-339.)  Ignoring this clear warning, Clay continued arguing about federal law and the National Labor Relations Act and refused to leave as directed.  (DA 339.)  At that point, Sergeant Shannon instructed Officer Kamenir to arrest Clay.  (DA 339.)

Reed, Marshall and Clay were the only ones arrested and the only reason the arrests occurred was because they refused to comply with police instructions.  (DA 522.)

### 7.    The Union quickly capitalized on the premeditated confrontation and publicity stunt.

In all, the Union created a 40 − 45 minute disruption at the Store that day.  (DA 384.)  Hoping for a story, Witt took selective notes during the stunt.  (DA 370, 827-830.)  Although advised she was not permitted to do so without the written consent of Fred Meyer, Nyberg photographed the event, including the arrests.  (DA 486.)

The Union wasted no time using Nyberg's photographs to garner as much publicity as possible about the events that day.  (DA 312-

313, 776-783.)  Although released from jail that same day with restrictions forbidding them from contacting one another, Reed, Marshall and Clay met with Union leadership on October 16 to discuss how best to spread the word about the incident.  (DA 291-293, 348-354, 774-786, 814.)  Stuart Fishman, a member of the Union's bargaining team, captured the essence of the scheme in an article, stating that "[o]ne Rep., Jennie Reed, planned to take the arrest if it was threatened; the others planned to leave before being arrested."  (DA 294-295, 784.)

Fred Meyer did not plan, nor did it ask, for the Union representatives to be arrested on October 15, 2009.  (DA 431, 449, 485, 513-514.)  After the arrests occurred, Fred Meyer did not take any action in furtherance of the prosecution of the arrested representatives.  (DA 451.)  Eventually, the Washington County District Attorney decided not to pursue the charges against the three union representatives.  (DA 753-758.)

## VI.   STANDING

Fred Meyer is a person aggrieved under 29 USC § 160(f).

35

## VII.  SUMMARY OF ARGUMENT

Fred Meyer requests that the Court grant its Petition for Review of the NLRB's April 30, 2015 Decision and decline to enforce the Board's Order.

Fred Meyer submits that the Board acted arbitrarily and lacked substantial evidence to support its finding that Fred Meyer violated sections 8(a)(1) and 8(a)(5) of the Act by : (1) telling employees not to speak to the union representatives; (2) disparaging the Union in the presence of employees; (3) threatening to have the Union representatives arrested; and (4) causing the arrest of three Union representatives. The Board repeatedly ignored undisputed testimony by Union witnesses against their own interests and erroneously interpreted and gave weight to suspect, hearsay, or deficient evidence. The Board ignored substantial, undisputed testimony by Union witnesses that the Union engaged in intentional misconduct and unilaterally changed the Store Visitation agreement and related past practices by planning and carrying out an eight-member siege of the Store including distributing petitions and engaging in lengthy discussions with employees on the sales floor, designed to create a confrontation with Fred Meyer and for which an International member was designated in advance

36

to take the expected arrest.  Further, the Board improperly ignored substantial evidence that the Union engaged in this misconduct for their own surreptitious publicity plans, stripping the Union representatives of the protections of the Act, as well as ignored substantial evidence that the International representatives possessed no contractual right to access Fred Meyer's property at all.

The Board further erred by finding that comments completely lacking any threat of reprisal or promise of benefit were unlawful merely because of their proximity to other allegedly unlawful conduct.  The Board misconstrued the record in finding substantial evidence that these comments were made in front of employees and further erred in finding that Fred Meyer threatened to arrest and caused the arrest of three Union representatives.

These significant errors are fatal to the Board's April 30, 2015 Decision and Order and Fred Meyer's Petition for Review should be granted.

1424/315 00715909 V 1

# VIII. ARGUMENT

## A.    Standard of Review.

This Court does not "merely rubberstamp NLRB decisions." *Avecor, Inc. v. NLRB*, 931 F2d 924, 928 (DC Cir 1991).  A Board decision will be overturned where it acted arbitrarily or otherwise erred in applying established law to the facts, or when its findings of fact are not supported by substantial evidence in the record as a whole. *Conagra, Inc. v. NLRB*, 117 F3d 1435, 1438 (DC Cir 1997).  "The court must take account of anything in the record that fairly detracts from the weight of the evidence supporting the Board's conclusion." *Reno Hilton Resorts v. NLRB*, 196 F3d 1275 (DC Cir 1999).

## B.    The Board Acted Arbitrarily By Ignoring Substantial Evidence That the Union Planned to Incite a Confrontation at the  Store on October 15, 2009 and That Such Conduct Lacked Protection of the Act.

Contrary to the well-developed reasoning of the dissent, the Board majority and the ALJ found insufficient evidence that the confrontation at the Store on October 15, 2009, was premeditated.  In support of its erroneous finding, the Board acted arbitrarily by cherry-picking evidence supporting the Union's version of events while at the same time ignoring other evidence *from Union witnesses* that belies the cherry-

1424/315 00715909 V 1

picked evidence.  As set forth below, multiple Union witnesses admitted not only that the October 15 event was a planned confrontation to challenge the limits of the Store Visitation agreement, but also that Reed planned in advance to "take the arrest" and that the Union did so in hopes they could create a story that was press-worthy.

> ### 1. The Union planned and executed a confrontation with Fred Meyer by intentionally breaching the access agreement.

Ignoring substantial conflicting evidence, the Board majority erroneously found the confrontation was not premeditated because: (1) the visitation policy does not limit the number of representatives that may visit a store at one time; (2) Union witnesses testified that they sent a large group that day to save time; and (3) Dostert was unaware that six other Union representatives were on the floor during his interactions with Reed and Witt.  (DA 196.)  All of these points improperly ignore substantial evidence to the contrary.[10]

---

[10] The Board dissent correctly found that the Union planned to engage in activity that exceeded the parties' past practice and incite a confrontation at the Hillsboro store on October 15 and thus, regardless of Dostert's precise knowledge or lack thereof of the unfolding events and Fred Meyer's resulting response, the Union was not engaged in protected activity and no liability can arise. (DA 196, fn 2.)

### a.   The October 15 confrontation was premeditated.

The Board erred by failing to even mention or consider any of the following substantial evidence demonstrating that the Union planned in advance to incite the confrontation at the Store to gain publicity:

1) <u>Late Summer 2009</u>-- shortly after Reed arrives, Thornton begins to receive reports of increased numbers of representatives failing to check in with the MOD, talking at length to employees on the sales floor, and confronting store management when asked to take lengthy conversations to the lunchroom.  (DA 249, 445-446, 455-457);

2) <u>Early Fall 2009</u>—decertification petitions filed at the Bend and Coos Bay, Oregon Fred Meyer stores.  (DA 445);

3) <u>Early Fall 2009</u>-- the Union changes its tactics and begins sending organizing representatives (from the International or borrowed from other locals) into the stores along with the field representatives to train the field representatives to act more like organizers.  (DA 282, 290, 761-766);

4) <u>September 17, 2009</u>--Reed and other Union representatives meet with Local 555's attorney to discuss "access to Fred Meyer stores, strategy and implementation."  (DA 759);

5) <u>September 21, 2009</u>—Spicher notes her plan to call several employees to "ask about [the] practice of talking to memb[ers] on floor," in anticipation of filing a grievance.  (DA 760);

6) <u>September 25, 2009</u>--Union leadership declares "WE ARE A FIGHTING UNION", promises to "do what is necessary" to be a fighting union, and "fights back" by filing unfair labor practice charges ("ULP") about alleged access issues.(DA 252, 767-771, 825);

7) <u>October 13, 2009</u>--The Union instructs members to "gather information" in support of its ULPs regarding Union access to Fred Meyer stores.  (DA 826);

8) <u>On October 14, 2009 (day)</u> -- Price breaches the access agreement by blocking a customer at the Store, instigates a heated dispute with management, and threatens to bring 15-20 representatives into the store the next day;

9) <u>October 14, 2009 (evening)</u> -- Reed conducts a multi-hour training in advance of entering the Store with eight representatives. The Union expects to have access issues and a confrontation with management and does not plan to de-escalate. Reed agrees to "take the arrest". (DA 208-209, 361-364, 367, 412-413);

10) <u>October 15, 2009</u> -- Eight non-employee representatives and a photographer fan out and enter multiple entrances of the Store at the same time. The Union hopes to "get a story." Only two representatives check in and the rest quickly disperse throughout the Store, talking at length with employees and distributing and asking employees to sign impermissible petitions while working. Reed does not identify herself and immediately demands the right to talk to employees on the sales floor for unlimited periods of time. Witt gets into Dostert's face and repeatedly yells he is a "liar!" The Union refuses to resolve dispute and threatens to send more representatives to the Store. Dostert again asks the representatives to leave and Reed says she will not leave unless arrested. The police arrive and Reed refuses to follow instruction to leave, saying she can take the trespass charge and sticks out her hands to be handcuffed. Nyberg asks the officer to pose for a picture with Reed in handcuffs. Marshall and Clay refuse to follow police instructions in the parking lot and are also arrested as more pictures are taken. (DA 213, 216, 218-222, 259, 323, 338-339, 356-357, 369, 385-386, 389, 434, 446-449, 472-473, 485-486, 499, 501-502, 505, 518-519);

11) <u>October 16, 2009</u>-- In violation of their release agreements, Reed, Marshall and Clay meet with Union leadership to plan publication about the October 15 confrontation. (DA 291-293, 348-354, 814);

12) <u>Shortly after October 16, 2009</u>--The Union drafts a press release and distributes information and pictures from the confrontation. (DA 294-295, 312-313, 774-786, 790-792);

13) <u>November 2009</u>-- The Union hires Nyberg. (DA 250, 355.)

The Board further ignored Reed's significant admission that the access issues in Fred Meyer stores began in August 2009-- right after she arrived. (DA 249.)

The above chronology paints a clear picture that only supports one logical conclusion-- the events at the Store on October 15 were premeditated. The Board acted arbitrarily and ignored substantial evidence by failing to even consider or address a few simple questions:

1) If the Union truly believed that past practice permitted more than two representatives in the store at the same time, why did they send only Reed and Witt to check in with the MOD?

2) If, as the Union testified, they expected access issues and a related confrontation, why didn't they discuss and plan for how to de-escalate that confrontation?

3) Why did Reed plan to "take the arrest" and so quickly volunteer to be arrested?

4) Why didn't Barclay accept Thornton's offer to resolve any access concerns the Union had prior to the arrival of the police?

5) Most strikingly, if this wasn't a planned confrontation for publicity purposes, why was Nyberg even there at all?

### b.  Past practice limits the number of visiting representatives and the Union violated that practice.

The ALJ and Board found that the parties' past practice limited conversations on the sales floor to "a minute or two or possibly longer depending on the circumstances", but the parties did not have a clearly defined past practice with regard to the number of representatives allowed on the floor at the same time.  (DA 192-193.)  Although correct about the practice regarding the length of conversations on the sales floor, the Board improperly ignored substantial evidence that past practice limited to two the number of representatives permissible at any one time.

Numerous Union and Fred Meyer witnesses, ***including all Hillsboro store union and management employees***, testified that the number of representatives present on the sales floor had been limited to two. Ball, a high ranking Local 555 official for years, could not recall any time that more than two representatives were sent into any store and Local 555 had always believed it would be inherently disruptive and would violate the access agreement to send in more than two representatives at a time.  (DA 402-406, 460.)  Thornton's testimony corroborated this.  Moreover, Spicher and all of the Store union employees (Epling, Larsen, and Cushing)

1424/315 00715909 V 1

testified that two representatives was the maximum number that had been in the Store at any one time.  (DA 263, 268, 272, 281 and 393.)

Despite the testimony of all of these Union and Fred Meyer witnesses with years of personal experience about the past practice regarding the number of permissible representatives, the ALJ and Board inexplicably chose to credit Reed's testimony that she went into other Fred Meyer stores a few times with more than two representatives. However, Reed had no foundation to testify about this past practice and offered inconsistent, unreliable testimony. Thus, reliance on Reed's testimony in this regard was arbitrary and erroneous.

First, according to Reed herself, she had never visited **_any_** Fred Meyer store in a representative capacity prior to her arrival in late July-early August 2009.  (DA 239.)  Further, Reed never received any training about the visitation practices at the Store, had only been to the Store a few times on routine visits, and had never visited the Store with more than two representatives prior to October 15, 2009.  (DA 254, 255.)

Second, Reed's testimony was inconsistent and not credible. Reed first testified on direct examination by both counsel for the GC and Union that she had personal knowledge of only two instances prior to the

**44**

October 15, 2009, incident at the Store where the Union had sent more than two representatives into a Fred Meyer store—in Tigard, Oregon and Bend, Oregon.  (DA 216-217.)  But on cross examination, Reed changed her testimony.  Reed at first testified as she had previously regarding the Tigard and Bend stores.  (DA 242.)  However, when Reed realized that the Bend store was not covered under the Portland Contracts, Reed suddenly "remembered" a third such visit to the West Hollywood store in Portland.[11]  (*Id.*)  Reed further testified that the Tigard, Bend and West Hollywood visits were all in September and October 2009, within weeks of the October 15 stunt at the Store, in sharp contrast to the years of personal knowledge of the other witnesses.  (DA 238, 243.)

**Third**, Reed was the only witness to proffer incorrect testimony about the parties' past practice.  Reed testified that Union representatives were permitted unlimited time to talk to members on the sales floor, including non-stop for a full eight-hour shift, as long as no customer interference occurred.  (DA 212, 246-248.)  Although in stark contrast to

_____

[11] Importantly, Reed testified that at the West Hollywood store, she and Clay checked in with the MOD and specifically informed the manager that there were five or six other representatives in the store. (DA 245.)

45

the "one to two minute" past practice found by the ALJ and Board, the

Board inexplicably credited Reed's testimony about the parties' past

practice regarding numbers of representatives.  Reed's testimony was not

credible, lacked foundation and was in stark contrast to the consistent,

credible testimony of numerous Union and Fred Meyer witnesses.  The ALJ

and Board erred in relying on Reed's testimony in any way regarding the

parties' past practice with respect to store access and visitation.

## C. Substantial Evidence Demonstrated That the Union Unreasonably Interrupted Employees' Work, Interfered With Customers or Disrupted Operations. The Board's Decision is Erroneous.

### 1. The Union representatives breached the access agreement and their conduct was unprotected.

The Board found that "there is no evidence that *any* of the other

union representatives unreasonably interrupted employees' work or

disrupted operations in any way."  (DA 194) (emphasis original.)  In doing

so, the Board ignored substantial evidence that the Union did, in fact,

breach the access agreement and related past practices in a manner that

was both overtly and inherently disruptive and the Union substantially

interfered with customers and operations. Thus, the representatives'

conduct was unprotected.  *See generally Mazzara Trucking & Excavating*

*Corp. & Local 172, Laborers Int'l Union of N. Am.*, 362 NLRB No. 79 (Apr 30, 2015)(union representatives' otherwise protected conduct lost protection of the Act because the union representatives improperly disrupted the employer's work).

      a.    **The Union unreasonably interrupted employees' work by distributing petitions and encouraging employees to read and sign them while working.**

The past practice adopted by the parties provides in pertinent part that:

> Business Representatives have ***the right to distribute fliers*** to employees on the floor AS LONG AS IT IS DONE QUICKLY, ***THE EMPLOYEES ARE NOT URGED TO STOP WHAT THEY ARE DOING TO READ THE MATERIALS AT THAT TIME***, AND FURTHER, THAT THE MATERIALS ARE NOT PASSED OUT IN THE PRESENCE OF CUSTOMERS.  (DA 787-789) (capitalized emphasis in original; bold, italics emphasis added.)

It is undisputed that, contrary to past practice, the representatives distributed on October 15 *both* a flyer *and a healthcare petition* to the employees on the sales floor at the Store.  Moreover, substantial evidence demonstrates that the representatives urged the employees to stop work to read and sign the petition that day.

On the morning of October 15, Miller was training Spicher on the "fighting union" program at another Fred Meyer store.  (DA 764-766.) Miller and Spicher spoke with an employee and Miller was upset that Spicher did not stay on message. Miller quickly intervened and "pushed the conversation to the flyer and petition."  (*Id.*)  Spicher had never taken a petition into a store before, did not believe that distributing petitions was part of her "normal job" and did not expect employees to read distributed materials while working. (*Id.*; DA 282-283, 285-286, 288-289.) Nevertheless, Miller's training included urging the employee to stop work while she explained both the flyer and petition and urging that employee to get more signatures on the petition while at work.[12]  (*Id.*)  Miller expressed displeasure that in contrast to "the program we had been instructed on the previous night", Spicher advised employees to obtain signatures on the

---

[12] Miller's report states "Mary handed him the flyer without explaining it and basically said here's our latest flyer. I again interceded and went over the flyer with the member. When it came to the petition Mary asked the member to sign it without explaining its purpose or its importance. The member works with the night crew and so I began to see if I couldn't get the member to take the petition and get the signatures of the people he worked with in the back from the night crew. " (*Id.*)

1424/315 00715909 V 1

petition while on break, rather than encouraging them to discuss the petition and get signatures during work hours. (*Id.*) Spicher testified that about 75% of the employees she encountered stopped working to read the petition and that reading the petition "took some time." (DA 284.)

Reed provided four to six hour of "fighting union" program training on the evening of October 14. Also on October 14, Miller provided such training to Spicher, including distributing a petition (a breach of the access agreement) and urging employees to read and sign those petitions while working in breach of past practice. Viewed in this context, there is substantial evidence that on October 14, the Union representatives urged employees in the Store to stop working, read and sign the petition; unreasonably interrupting the employees' work.

> **b.**    **Sending more than two employees at once into the store unreasonably interrupted employees' work.**

The Board also improperly ignored substantial evidence that sending more than two representatives into the store on October 15 unreasonably interfered with employees' work. Ball, the Union's long-standing Bargaining and Organizing Director until the new, "fighting union" leadership was elected, testified that the Union had consistently

limited the number of representatives that would be sent to a store at any

one time to two representatives because any more than that would interfere

with employees' work:

> Q:  What was the concern with exceeding more than two people
> in the store?
>
> A: Well, basically we felt that it would interfere with the work of
> the employees in there, and that would get us into hot water.
>
> Q: Did the Local believe that sending more than two people into
> the store at a time would be a violation of the existing language?
>
> A: Yes.  (DA 410-411.)

Viewed together with the improper petitioning and

encouragement to read and sign the flyer and petition while working,

substantial evidence supports that a significant interference with

employees' work occurred on October 15 and the Board erred by ignoring

that evidence.

> ### c.    The Union further violated the store visitation agreement by interfering with customers.

Contrary to the Board's findings, there is substantial evidence in

the record that the Union interfered with customers and operations as a

result of their premeditated confrontation on October 15.  For instance, as

noted by the ALJ, Reed in her testimony "described a scene of confusion"

that included customers trying to leave the store.  (DA 38, 42-45.)

Customers had trouble getting through the Apparel entrance as the confrontation escalated. (DA 498.) Officer Mace described the scene as "starting to get a little hairy" and "getting a little out of hand" and with members of the public gathering to look, "[i]t was starting to become a distraction to the community." (DA 502-504.)

Moreover, operations were disrupted because numerous members of store management had to deal with the confrontations rather than focusing on managing the store. (DA 447-449, 452-454, 456-459, 471-496, 504-508, 510-512, 793.)

**2.    Fred Meyer retains discretion to determine what constitutes an unreasonable work interruption and the Board's finding to the contrary is antithetical to the Act.**

The Act seeks to serve the public interest by maintaining and promoting labor peace and minimizing disruptions to interstate commerce. 29 USC §151. The store visitation agreement negotiated by the parties as part of their CBA is in furtherance of this purpose since it provides for brief, non-disruptive visits by non-employee representatives with union members in the workplace while balancing the employer's interests in maintaining productivity in the workplace.

1424/315 00715909 V 1

The Board found that although the access agreement mandates that such visits will not "unreasonably interrupt employees with the performance of their duties," the agreement does not vest Fred Meyer with the unfettered discretion to determine what is unreasonable. The Board is factually incorrect. Moreover, such finding creates a powerful disincentive for employers to agree to such access agreements in contravention to the purposes of the Act.

**First**, the Board erred in finding that Fred Meyer lacked discretion to determine what constitutes an unreasonable interruption with an employee's work under the agreement. The store visitation provision is incorporated into the CBA as Article 13.11. Although an unreasonable interruption of work is not defined in this Article or anywhere else in the CBA, the Management Rights clause (Article 21) provides:

> 21.1    Except as herein clearly and explicitly limited in the express terms of this Agreement, the rights of the Employer in all respects to manage its business and affairs shall be unimpaired.

Since Fred Meyer did not clearly or expressly limit its right to solely determine what would constitute an unreasonable interruption of work, it retains the discretion to make this determination. Should the Union disagree with Fred Meyer's determination, its sole mechanism to seek

52

redress is found in the Grievance and Arbitration revisions in Article 19 of the CBA.

**Second**, the Board further erred because by incorrectly stripping Fred Meyer of the discretion to determine what constitutes an unreasonable work interruption, it created a strong disincentive for other employers to agree to such provisions and diminishes the beneficial contributions of such agreements towards labor peace.  Under the Board's decision, an employer entering into such an agreement would, at the least, be required to confer with a union and, worse still, bargain with a union over what constitutes an unreasonable interruption in the employer's production. This places employers in the unenviable position of having to bargain over just how much production limitation and financial damage it is willing to accept before such harm becomes "unreasonable." Such a significant limitation on an employer's right to operate would serve as a strong disincentive for any employer to enter such an access-visitation agreement.

1424/315 00715909 V 1

**D.    The Board Erred in Finding that Dostert Unlawfully Disparaged the Union.**

The Board erred when it found Dostert's statements on October 15 violated Section 8(a)(1). The Board's decision misinterprets the record evidence and ignores the plain language of Section 8(c) of the Act.

**1.    The Board misinterpreted the record evidence and improperly ignored the plain language of Section 8(c).**

The provisions of Section 8(c) incorporate the First Amendment and recognize its protections.  As this Court has noted:

> [A]n employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the Board. Thus, § 8(c) (29 USC § 158(c)) merely implements the First Amendment by requiring that the expression of 'any views, argument, or opinion' shall not be 'evidence of an unfair labor practice,' so long as such expression contains 'no threat of reprisal or force or promise of benefit' in violation of § 8(a)(1).  *Laborers' Dist. Council of Georgia & S. Carolina v. N. L. R. B.*, 501 F.2d 868, 874 (D.C. Cir. 1974)(employer's statements about union made to employees before union election protected and lawful).

The Board and ALJ found that Dostert violated Section 8(a)(1) by stating in England's presence: union representatives are jerks; unions are outdated and ridiculous; union dues are ridiculous; and union representatives and the union are stupid.  (DA 62:49-50.)  Facially, all of these comments are protected First Amendment opinion speech under 8(c).

But the Board took the extraordinary position that even if facially protected in substance, Dostert's statements were unlawful due to their proximity in time to other unfair labor practices. In doing so, the Board erred in a number of ways.

**First**, the plain language of Section 8(c) provides no exception for remarks made in the context of other unfair labor practices as the Board found here.  8(c) protects the expression of "any views, argument, or opinion" as long as such expression contains "no threat of reprisal or force or promise of benefit." It is indisputable that no record evidence reflects that Dostert's statements contain any such threat or promise.

**Second**, the Board acted arbitrarily and lacked substantial evidence to support its findings. The Board found that Dostert "engaged in an angry tirade against the Union and its representatives—*fum[ing] in front of at least one employee [England]*..." (DA 195)(emphasis added.) However, the record belies this.  Reed testified that when Dostert made these statements, they had already walked away from England.  (DA 228-231.)  Reed further testified that she recalled seeing two, unidentified employees in the area about five to ten feet away.  But the record is devoid

55

of any evidence that these or any other employees heard these alleged

comments by Dostert.[13] (*Id.*)

Further, the Board repeatedly found that Dostert threatened to

have the union representatives arrested.  (DA 193, 195.)  Contrary to these

findings, there is no evidence that Dostert ever threatened to have the

union representatives arrested.  Rather, Counsel for the GC asked Reed,

"Did [Dostert] indicate what he was going to do if you didn't leave?" to

which Reed replied, "No, not that I remember."  (DA 231.)[14]

---

[13] There is no evidence that England or any other employee heard any discussions that occurred between Dostert, Reed and Witt. England is hard of hearing, must wear hearing aids, hears best when facing the speaker and augments her hearing with lip reading.  (DA 62, 325-326, 478).  However, the ALJ and Board erred in finding that England "was facing Reed and Dostert" and "was focusing on the two individuals."  (*Id.*) Surveillance video in evidence shows clearly that Reed, Dostert and Witt moved away from England and England turned her back to them.  (DA 746, 9:49:07 a.m.)  England then began to assist a customer and England's back remained turned towards Dostert and the Union representatives.  (DA 746, 9:50:51 a.m.)  Thus, England could not have heard these alleged statements by Dostert.

[14] Moreover, in order for a party to make a threat in violation of Section 8(a)(1), the action threatened must be within its power to carry out. *Sears Roebuck and Co.,* 305 NLRB 193 (1991), *citing Gauley Industries*, 260 NLRB 1273, 1279 (1982)(finding manager's remarks flip and intemperate but protected expression of personal opinion under 8(c)). Here, the police, not Dostert, had the authority to make an arrest.

56

## 2.    The Board's cited precedent is distinguishable.

To support application of its novel "proximity" theory, the Board cites *Turtle Bay Resorts*, 353 NLRB 1242, 1278-1279 (2009) and *Fieldcrest Cannon, Inc.,* 318 NLRB 470, 474 (1995) *enfd. in part* 97 F3d 65 (4th Cir 1996). Both *Turtle Bay* and *Fieldcrest* are distinguishable and fail to aid the Board.

In *Turtle Bay*, the Board found that a manager's statements lost protection of the Act when the manager, in the presence of other employees, made negative remarks about the Union ***and threatened to discipline any employee who spoke with the representative***. (*Id.*)  *Turtle Bay* is distinguishable because it involved a clear threat of discipline.  Further, *Turtle Bay* in no way mentions or involved the proximity of the manager's comments to other unfair labor practices.

*Fieldcrest Cannon* is similarly distinguishable. Unlike the limited, relatively innocuous, access-related unfair labor practices alleged here, *Fieldcrest Cannon* involved "100 plus" violations in which "Fieldcrest simply adopted a scorched earth, take-no-prisoners approach to stop unionization without regard to statutory limitations."  *Fieldcrest Cannon,* 97 F3d at 73.  Further, to support its "proximity" theory, the Board merely

cites to its order in *Fieldcrest* prohibiting the employer from "making

disparaging remarks about the Union in a context of other coercive

statements." 318 NLRB at 474. This reference provides no authority or

support for the Board's position here.

**E.    The Board Erred in Finding Fred Meyer Liable for the Arrests of the Union Representatives and in Ordering Fred Meyer to Make the Union Whole.**

The ALJ and Board found that Fred Meyer violated Section

8(a)(1) by threatening, then causing, the arrests and subsequent criminal

prosecutions of Reed, Marshall and Clay and ordered Fred Meyer to make

the Union whole for any attorneys' fees and costs related to those arrests.

(DA 67.) The Board erred in numerous ways.

**1.    Fred Meyer's call to the police was a protected First Amendment petition to the government.**

The Board affirmed the ALJ's finding that Dostert's statements

that he would call the police and, in fact, called the police to have the union

representatives removed from the store was unlawful. The Board's ruling is

incorrect because the *Noerr-Pennington* doctrine shields those statements

and actions from any liability under the Act.

The First Amendment's Petition Clause protects "the right of

the people ... to petition the government for a redress of grievances." U.S.

Const. Amend. I. When "a person petitions the government" in good faith, "the First Amendment prohibits any sanction on that action." *Nader v. Democratic National Committee*, 567 F3d 692, 696 (DC Cir 2009). Under the *Noerr-Pennington* doctrine, "conduct that constitutes a direct petition to government, but would otherwise violate the Act, is shielded from liability by the First Amendment." *Venetian Casino Resort, L.L.C. v. N.L.R.B.*, 793 F3d 85, 87 (DC Cir 2015).

In *Venetian Casino,* this Court recently overturned the Board's finding that the Venetian committed an unfair labor practice by requesting that police issue criminal citations to demonstrators and block them from the resort's walkway because they were allegedly trespassing. *Id*. This Court held that the act of summoning the police to enforce state trespass law is a direct petition to government subject to protection under the *Noerr–Pennington* doctrine. *Id*. at 90.

*Venetian Casino* instructs that Fred Meyer cannot be liable for Dostert's statements about calling or actually calling police after the October 15 confrontation at the Store, nor can it be liable for any fees or costs incurred by the Union related to the representatives' arrests.

59

2.    **The Board ignored substantial evidence that the representatives' own conduct was unprotected and warranted arrest.**

a.    **Reed was not engaged in protected activity and her own misconduct resulted in her arrest.**

The ALJ and Board found that Fred Meyer was liable for Reed's arrest because she was properly exercising her contractual right to visit represented employees in the Hillsboro Store on the day she was arrested. This was error.

**First**, Reed was not engaged in protected conduct by exercising her contractual right to visit employees at the Store on October 15 because she had no such right. As an employee of the International that is not a signatory to the CBA, Reed had no right to be on Fred Meyer property other than the right of a typical customer invitee.

**Second**, Reed's conduct was not protected because substantial evidence demonstrates that she engaged in a premeditated breach of the access agreement in the CBA. The uncontroverted record evidence establishes that Reed and the Union planned to create access issues at the Store that day; planned a confrontation with Fred Meyer management; did not plan to de-escalate that confrontation; and Reed decided in advance to

60

"take the arrest" following such confrontation.  In doing so, Reed lost the protections of the Act.

Moreover, Reed wanted, expected and chose to get arrested despite being given multiple opportunities to avoid arrest. Prior to the police's arrival, Dostert repeatedly told Reed it "could end right then" if she simply agreed to follow the policy or leave.  (DA 486.)  Reed's response? She would not leave the store unless she was arrested.  (DA 485.)  Marshall called Reed on her cell phone to tell her that the police had arrived.  (DA 389.)  Reed's response?  She stashed her purse with Witt in anticipation of "taking the arrest."  (DA 10:11:43, 389, 487, 748.)

Reed also rejected numerous chances to avoid arrest offered by the police. Officer Mace asked Reed several times to leave the store because he didn't want to have to arrest her.  (DA 499.)  Reed was advised that if she refused to leave, she would be taken into custody.  (DA 518.)  Reed's response? "I can take a trespass charge" and then stuck her hands out together in front of her to be cuffed.  (DA 434, 499, 518.)  Had Reed followed police instructions, she would not have been arrested. According to Officer Mace, it appeared Reed "wanted to go to jail."  (DA 500, 506.)

The Board erred by failing to give proper weight to substantial evidence that Reed was not engaged in protected conduct on October 15 and Reed's own conduct warranted arrest and was the sole reason for her arrest.

### b. Clay's conduct was not protected and Marshall and Clay's failure to follow police orders resulted in their arrest.

Similarly, the only reason that Marshall and Clay were arrested was because they refused to comply with police instructions. (DA 522.) Marshall chose to ignore a clear, direct instruction from Sergeant Shannon to leave the property. (DA 519.) Instead of complying, Marshall became agitated and argued with Sergeant Shannon, leading to his arrest. (DA 505.)

Clay arrived at the scene on the heels of Marshall's arrest. (DA 335-336.) Clay was not at the Store visiting employees, thus he had no protected right under the CBA to be on Fred Meyer's property. Regardless of Fred Meyer's actions, Clay's arrest fails to implicate the Act. Moreover, just like Marshall, Clay chose to argue with Sergeant Shannon and ignored clear police instructions.

62

The Board erred by failing to give proper weight to substantial evidence that Clay was not engaged in protected conduct on October 15 and Marshall and Clay's own conduct warranted arrest and was the sole reason for their arrest.

### 3. The Board erred in finding that the arrests were the "proximate and foreseeable" result of Fred Meyer contacting the police.[15]

Relying on *Wild Oats Markets, Inc.*, 336 NLRB 179 (2001), the ALJ and Board also found that Fred Meyer was liable for the arrests of Marshall and Clay because their arrests were the "proximate and foreseeable" result of Fred Meyer contacting the police to assist in removing the Union representatives from the store.  (DA 59.)  *Wild Oats* is distinguishable and such reliance on *Wild Oats* is misplaced.

Contrary to the undisputed exclusionary property interest of Fred Meyer here, the employer in *Wild Oats* did not have a property interest that entitled it to expel the union picketers from its store parking lot because the employer merely leased its property.  Moreover, unlike here,

---

[15] All of the arguments herein assume *arguendo* that Fred Meyer's conduct in contacting the police was not privileged under the *Noerr-Pennington* doctrine.

the employer in *Wild Oats* did not contact the police itself and the Board applied the "proximate and foreseeable" consequences standard in order to find liability for that indirect action.

Where, as here, Fred Meyer directly called the police, the appropriate standard to be applied is found in *Baptist Memorial Hospital*, 229 NLRB 45 (1977). Under that standard, the Board will hold an employer liable for the arrest of a union representative only when that arrest "stem[s] solely from the [employer's] persistent effort to maintain and enforce its unlawful policies and to thwart the protected organizational activities of its employees." When the arrest is not solely the result of an employer's unlawful conduct, but is warranted by the representative's conduct, the Board will not find the Employer liable for such an arrest. *Id.* at 46 fn. 10.

Here, the union representatives' arrests did not stem solely from Fred Meyer's persistent effort to maintain and enforce its unlawful policies and to thwart the protected organizational efforts of its employees. Fred Meyer was not maintaining and enforcing an unlawful policy; it was lawfully enforcing the parties' access agreement in the face of the Union's numerous breaches of that agreement. Furthermore, the arrests were not solely the result of unlawful conduct by Fred Meyer. Starkly to the contrary

**64**

and confirmed by the arresting officers, the arrests were solely the result of the representatives' individual refusals to comply with police instruction.

The Board failed to distinguish, or to even address, *Baptist Memorial*, and thus erred in the application of its own precedent.[16]

### 4. The Board erred in ordering Fred Meyer to pay the representatives' attorney fees and costs.

The request for attorneys' fees is an extraordinary one. The Board ordinarily limits the award of attorneys' fees to only those cases in which an employer has engaged in frivolous litigation, *Wellman Industries*, 248 NLRB 325 (1980), where there has been a long history of blatant disregard of prior Board Orders, *J.P. Stevens, Inc.*, 244 NLRB 407 (1979), or where the employer engaged in "clearly aggravated and pervasive" misconduct reflecting "flagrant repetition" of unlawful conduct. *Hecks, Inc.* 215, NLRB 765, 767 (1974). The Board will order attorneys' fees in cases

---

[16] The Board's finding should further be rejected because there is no evidence that the arrests were foreseeable. Neither Thornton nor Dostert thought that anyone would be arrested at the Store that day since in all prior similar situations, the representative voluntarily left before or once the police arrived. (DA 449-450.) Moreover, absent knowledge of similar past wrongdoing, individuals reasonably expect that others will follow the law. *McPherson v. State ex rel. Dep't of Corr.*, 210 Or App 602, 615, 152 P3d 918, 925 (2007). (criminal act of a third-party not foreseeable unless the defendant knows or should know of prior crimes that are highly similar to the crime at issue).

65

such as this only where the employer acted egregiously in having a union representative arrested for trespass (such as where the representative was on public property), *Hearn Construction*, 354 NLRB 289, 293-94 (2009), criminal trespass litigation arises from assertion of invalid private property interests, *Macerich Property Management Company*, 1999 WL 33452912 at 8-10 (Feb 5, 1999) (not reported in Board volumes); or where the employer pursued criminal trespass charges for improper reasons. *Baptist Memorial Hospital*, 229 NLRB at 46.

Here, Fred Meyer did not engage in aggravated and flagrantly repetitive unlawful conduct, did not act egregiously in seeking the removal of the representatives from its private property, nor did it pursue criminal trespass charges at all, much less for improper reasons. Rather, substantial evidence supports that the October 15, 2009 confrontation at the Store and later arrests were precisely what the Union desired and planned for. This evidence includes Reed's plan to "take the arrest" and excited willingness to be cuffed, Witt's plan to bring Nyberg because he hoped "she would get a story out of it," and Nyberg's request that the arresting officers pose for pictures.

**66**

The Union simply should not be permitted to benefit from its disruptive and unlawful conduct in the Store on October 15 by having its attorneys' fees and costs paid by Fred Meyer.  The Board erred in finding Fred Meyer caused the arrests of the union representatives and further erred in finding it liable for the costs incurred in the criminal defense of the arrestees.

## F.  The Union's Motion to Intervene Should Be Denied as Untimely.

Local 555, charging party in the proceeding below, seeks leave to intervene in this case. Fred Meyer filed its Petition for Review on May 12, 2015 and the Board filed its Cross-Application for Enforcement on June 12, 2015.  Local 555 filed its Motion for Leave to Intervene on July 9, 2015. Local 555's Motion for Leave to Intervene was untimely and should be denied.

FRAP 15(d) provides:

"[u]nless a statute provides another method, a person who wants to intervene in a proceeding under this rule must file a motion for leave to intervene with the circuit clerk and serve a copy on all parties.  The motion – or other notice of intervention authorized by statute – *must be filed within 30 days after the petition for review is filed* and must contain a concise statement of the interest of the moving party and the grounds for intervention." (emphasis added).

1424/315 00715909 V 1

No statute authorizes a different method of intervention here and the timely filing period identified in FRAP 15(d) is clear, unambiguous and mandatory.  Circuit Rule 15(b) does not modify the timely filing requirements of FRAP 15(d) in any way.  An intervention must be timely. *N. L. R. B. v. Shurtenda Steaks, Inc.*, 424 F2d 192, 194 (10th Cir 1970) (denying as untimely union's motion to intervene in NLRB contempt proceedings).  Local 555 avers that its Motion to Intervene is timely filed because it was filed within 30 days of the filing of the Cross-Application for Enforcement. Local 555 is incorrect and the Motion should be denied.

### 1.    There is no legal basis for the interpretation urged by Local 555.

Local 555 contends that FRAP 15 (d) should be interpreted to mean that an intervening party may timely move for intervention within 30 days of *either* a petition for review *or* an application for enforcement. Despite FRAP 15(d)'s applicability to federal circuits around the country, no circuit court has interpreted this rule in the manner Local 555 suggests. Moreover, FRAP 15(d) has been amended numerous times, including as recently as December 1, 2009, and the Supreme Court has not found it necessary or prudent to amend the language of FRAP 15(d) in the manner urged by Local 555.

1424/315 00715909 V 1

FRAP 15(d) contemplates that a statute may substantively provide another method other than that set forth within the rule. However, the applicable provisions of the NLRA do not even mention intervention. 29 USC § 160(e)(f).  Local 555 avers that this Court should simply revise the express language of the federal rule by *ad hoc* interpretation in this particular case. Although this Court is indisputably empowered to create rules for the conduct of its business, 28 USC § 2071(a), and has previously implemented Circuit Rule 15(b) expanding upon FRAP 15(d), it would be inappropriate and would substantially prejudice Fred Meyer were this Court to simply change its own rules mid-stream.

### 2.    No factual basis exists for the interpretation urged by Local 555.

Local 555 argues that were this Court to interpret FRAP 15(d) in accordance with its plain language, doing so would lead to "nonsensical results."  However, FRAP 15(d) has been in effect since July 1, 1968 and Local 555 cites to no such nonsensical results or challenges thereof occurring anywhere at any time.  Were Local 555 correct, surely such nonsensical results would have been challenged by some party somewhere in the past 48 years.  Moreover, a review of the circuit court rules applicable

to all federal circuits reveals that no circuit court has adopted the interpretation of FRAP 15(d) urged by Local 555.

Local 555 further avers that application of FRAP 15(d) according to its terms would leave the court with no timeline to apply for a motion to intervene following an application for enforcement when no petition for review is filed. However, Fred Meyer timely filed its Petition for Review and such argument engages in no more than conjecture about circumstances not present here nor ripe for consideration.

Similarly, Local 555 argues that application of the express language of the rule would prevent an ostensible intervenor who fails to intervene following a petition for review from timely moving to intervene in response to new issues raised by an answer to a cross-application for enforcement. But in reality, by the time a petition for review of a Board decision is filed, the parties have extensively litigated underlying objections to the findings of the ALJ and the issues presented are well known. Moreover, an application or cross-application for enforcement must contain only a concise statement of the proceedings in which the order was entered, the facts upon which venue is based, and the relief requested. FRAP 15(b)(3). Thus, an answer to an application for enforcement typically

includes no more than a statement that the application for enforcement should be denied and no new issues are raised.

Local 555's Motion seeks a solution lacking a problem. The speculative issues raised by the Union in support of what it urges FRAP 15(d) *should* say or be construed to say have failed to arise anywhere since the rule took effect in 1968. The Motion to Intervene is untimely and should be denied.

## IX. CONCLUSION

For all of the reasons set forth above, Fred Meyer respectfully requests that this Court grant its Petition for Review and deny the Board's Cross-Application for Enforcement and the Union's Motion to Intervene.

RESPECTFULLY SUBMITTED: July 1, 2016.

BULLARD LAW

By s/Mitchell J. Cogen
   Mitchell J. Cogen,
   D.C. Cir. No. 55455
   200 SW Market Street, Suite 1900
   Portland, OR 97201
   503-248-1134/Telephone
   Attorneys for Petitioner
   Fred Meyer Stores, Inc.

71

## FEDERAL RULE OF APPELLATE PROCEDURE 32(a)(7)(C) CERTIFICATE

Pursuant to Fed. R. App. P. (a)(7)(C), I certify that this brief contains 13,792 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(ii) and further excluding Section F, which is a response to Local 555's Motion to Intervene ordered by the Court. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Georgia font, size 14 point.

Dated:       July 1, 2016

BULLARD LAW

By s/Mitchell J. Cogen
   Mitchell J. Cogen,
   D.C. Cir. No. 55455
   200 SW Market Street, Suite 1900
   Portland, OR  97201
   503-248-1134/Telephone
   Attorneys for Petitioner
   Fred Meyer Stores, Inc.

1424/315 00715909 V 1

# X.   ADDENDUM OF STATUTES, RULES AND REGULATIONS

## 29 U.S.C. §151

It is declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.

## 29 USC § 158

(a) [Unfair labor practices by employer] It shall be an unfair labor practice for an employer--

   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [section 157 of this title];

   (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a) [section 159(a) of this title].

(c) [Expression of views without threat of reprisal or force or promise of benefit] The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act [subchapter], if such expression contains no threat of reprisal or force or promise of benefit.

## 29 USC § 160

(f) [Review of final order of Board on petition to court] Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein

such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such court a written petition praying that the order of the Board be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Board, and thereupon the aggrieved party shall file in the court the record in the proceeding, certified by the Board, as provided in section 2112 of title 28, United States Code [section 2112 of title 28]. Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e) of this section, and shall have the same jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper, and in like manner to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board; the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive.

## 28 USC §2071
### (Rule-making power generally)

(a) The Supreme Court and all courts established by Act of Congress may from time to time prescribe rules for the conduct of their business. Such rules shall be consistent with Acts of Congress and rules of practice and procedure prescribed under section 2072 of this title.

(c) (1) A rule of a district court prescribed under subsection (a) shall remain in effect unless modified or abrogated by the judicial council of the relevant circuit.
(2) Any other rule prescribed by a court other than the Supreme Court under subsection (a) shall remain in effect unless modified or abrogated by the Judicial Conference.

## 28 USC §2072
### (Rules of procedure and evidence; power to prescribe)

(a) The Supreme Court shall have the power to prescribe general rules of practice and procedure and rules of evidence for cases in the United States

district courts (including proceedings before magistrate judges thereof) and courts of appeals.

(b) Such rules shall not abridge, enlarge or modify any substantive right. All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect.

## Fed. R. App. P. 15

(d) Intervention. Unless a statute provides another method, a person who wants to intervene in a proceeding under this rule must file a motion for leave to intervene with the circuit clerk and serve a copy on all parties. The motion—or other notice of intervention authorized by statute—must be filed within 30 days after the petition for review is filed and must contain a concise statement of the interest of the moving party and the grounds for intervention.

## DC Cir Rule 15

(b) Intervention. For purposes of FRAP 15(d), a motion to intervene in a case before this court regarding review of agency action must be served on all parties to the case before the court. A motion to intervene in a case before this court concerning direct review of an agency action will be deemed a motion to intervene in all cases before this court involving the same agency action or order, including later filed cases, unless the moving party specifically states otherwise, and an order granting such motion has the effect of granting intervention in all such cases.

1424/315 00715909 V 1

## CERTIFICATE OF SERVICE AND FILING

I hereby certify that on July 1, 2016, I electronically filed the foregoing OPENING BRIEF OF PETITIONER FRED MEYER STORES, INC. with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I further certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Mitchell J. Cogen
Mitchell J. Cogen, D.C. Cir. No. 55455
200 SW Market Street, Suite 1900
Portland, OR  97201
503-248-1134/Telephone
503-224-8851/Facsimile
Attorneys for Petitioner
Fred Meyer Stores, Inc.